Filed 7/11/13  Rancho Guejito v. Perdue CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| RANCHO GUEJITO CORPORATION, | D062161 |
| Respondent, | |
| v. | (Super. Ct. No. 37-2012-00051611-CU-PT-NC) |
| MITCHELL A. PERDUE, | |
| Appellant. | |

APPEAL from orders of the Superior Court of San Diego County, Robert P. Dahlquist, Judge.  Affirmed.

The McDonald Firm, Stephen P. McDonald and Tina J. Arciaga for Appellant.

Sheppard Mullin Richter & Hampton and Guylyn R. Cummins for Respondent.


I.

INTRODUCTION

Rancho Guejito Corporation (Rancho Guejito) filed a petition seeking a workplace

violence restraining order against Mitchell A. Perdue after a series of incidents involving

Perdue after Rancho Guejito refused to pay Perdue approximately $326,000 for services that he claimed he had provided to Rancho Guejito. Prior to the hearing on Rancho Guejito's petition for a permanent workplace violence restraining order, Perdue filed a special motion to strike under the anti-SLAPP (strategic lawsuit against public participation) law. The trial court denied the motion to strike, and proceeded to issue a three-year workplace violence restraining order against Perdue.

On appeal, Perdue contends that the trial court erred in denying his anti-SLAPP motion, and further contends that the trial court erred in issuing the workplace violence restraining order. We conclude that Perdue has not established reversible error, and, therefore, affirm the orders of the trial court.

II.

FACTUAL AND PROCEDURAL BACKGROUND

A.      *Factual background*

Rancho Guejito is a 23,000-acre ranch in San Diego County. In 2005 and 2006, Perdue provided rangeland management services to Rancho Guejito pursuant to written contracts. The contracts provided that Perdue would be paid between $4,000 and $12,000 for his services. Although the record is not clear, it appears that Perdue may have continued to provide services to Rancho Guejito without a written contract until he was terminated as a consultant sometime in mid-2011.[1]

---

[1]      The parties dispute Perdue's involvement at Rancho Guejito after the completion of the original contracts.

In October 2011, Perdue asked for a meeting with Rancho Guejito's chief operating officer and general counsel, Hank Rupp. Rupp and his assistant, Sheryl Barnett, agreed to meet with Perdue at a restaurant. At that meeting, Perdue presented Rupp and Barnett with an "invoice" for $326,000 for services and work that he claimed to have provided to Rancho Guejito. When Rupp would not agree to pay Perdue what Perdue was demanding, Perdue became angry. At some point Perdue said, "It would go a lot better for Rancho Guejito if I was your friend rather than your enemy." When Rupp asked Perdue what he meant by that statement, Perdue responded, "You'll see." According to Barnett, during the exchange, Perdue "got very red in the face and his jaw started moving back and forth and his tone of [] voice accelerated." Rupp could tell that Perdue was "really angry" and described Perdue's demeanor as "seething." Rupp interpreted Perdue's "You'll see" as a threat that went beyond extortion.

After that meeting, Rancho Guejito hired an outside attorney, Gregory C. Kane, to deal with Perdue. On November 1, 2011, Rancho Guejito informed Perdue that he was not to contact Rancho Guejito employees, but instead, should have contact only with Kane.

Despite having been told to communicate only with Kane, Perdue continued to contact Rancho Guejito employees by telephone, e-mail, and in person concerning his demands. For example, on November 17, 2011, Perdue sent an e-mail to Rupp asking when Rancho Guejito would respond to his demands for payment. Barnett responded to this e-mail by telling Perdue that he was to direct his communications to Kane. Kane sent an e-mail to Perdue the following day reminding Perdue to communicate only with

3

Kane and directing him not to try to communicate with Rancho Guejito employees. Kane informed Perdue that Perdue's e-mail address was being put on a " 'blocked sender list.' "

On December 2, 2011, Perdue went to the Rancho Guejito property. The property is fenced and secured. Perdue parked his car behind some vegetation, out of sight of the offices, and approached the gate on foot. Over an intercom Perdue told Jacqueline Soto, a Rancho Guejito employee, that he had a delivery. Because Soto did not know Perdue, he was able to get her to open the gate. Perdue walked onto the property, and Soto met him outside the office building. Perdue asked to see Barnett. Soto started to walk toward the office building, and Perdue followed her. Barnett looked out the window and recognized Perdue. Barnett opened the office door just slightly and told Soto that the man was Perdue. She also informed Perdue that she would not meet with him.

Soto went into the office immediately, and Barnett closed and locked the door. Perdue continued to talk to Barnett through the door. She told him, "I'm not talking to you or accepting anything from you." Perdue asked for a pen, and Barnett repeated what she had just said. Barnett knew that Perdue had been told not to contact Rancho Guejito employees and was "unnerved" by his appearance at the office. She was determined not to open the door. Perdue stepped up onto the stoop and "shoved something into the door." Barnett worried that he was going to try to come into the office. Soto interpreted Perdue's actions as "tr[ying] to force his way inside the office." The envelope that Perdue left contained his "final invoices."

Kane e-mailed Perdue that day to again direct him not to make any efforts to contact Rancho Guejito employees.

4

On December 13, 2011, Kane sent Perdue an e-mail asking him questions about whether Perdue had been hunting on the Rancho Guejito property over the past four years. Perdue responded to Kane two days later.

On January 10, 2012, Perdue wrote a letter to Theodate Coates, a director of Rancho Guejito who works in New York. In the letter, Perdue acknowledged that he had hired a helicopter to fly him over the ranch property. Perdue threatened to report Rancho Guejito to government authorities concerning some dead cattle that he had seen on the ranch, as well as with respect to some grading that he had observed on the property. When Kane found out about Perdue's letter, he e-mailed Perdue yet again to inform him that his actions were unacceptable and that he was going to be placed on the " 'blocked sender' " list for Rancho Guejito personnel in New York, as well. Kane also advised Perdue that if he continued to engage in similar behavior, Rancho Guejito would seek a restraining order against him. In response, Perdue stated, "It seems to me that the management there has enough problems already without pissing me off."

On January 20, 2012, Perdue sent an e-mail to Kane, Rupp and other Rancho Guejito personnel in which he again demanded payment and threatened to go to the media with "all of the activities and actions that I have observed on the ranch." Perdue sent this e-mail from a different e-mail address, apparently in an effort to avoid having his e-mail blocked.

On February 14, 2012, Rancho Guejito employees noticed a white truck driving up the dirt road that led to the entrance gate to Rancho Guejito. The employees

5

recognized Perdue as the driver. He was accompanied by two men.[2] The employees drove toward the main entrance to see what Perdue was doing. Perdue stopped the truck and one of the passengers began taking photographs of the property. The employees believed that Perdue was inspecting the mounted security cameras at the entrance. Before the employees could make contact with Perdue, he and the man who had been taking photographs got back into the truck and left.

Later in February, Perdue returned to the Rancho Guejito property on prearranged visits, ostensibly to retrieve certain personal items that he had left there.[3] On February 17, 2012, Rancho Guejito personnel placed the items outside of the Rancho Guejito gate. Upon arriving, Perdue asked the security personnel, " 'Who are you? What's your name?' " The security personnel described Perdue's demeanor as "confrontational and combative."[4] Perdue took photographs of the Rancho Guejito security personnel. After hooking up a trailer to his truck, he asked them, " 'Do you have permits?' " One employee interpreted Perdue's question as asking whether they had permits for their weapons. "[I]n an adversarial tone" Perdue stated, " 'You know this is a county road all the way up to the double gates[.]" Perdue asked other questions, but the security

_____

[2]    Perdue states that the men who accompanied him were a journalist and a photographer.

[3]    The items included "severely rusted" wire cages and an "old boat trailer" that was also rusted. Rupp stated at the hearing that his understanding was that the items did not belong to Perdue, but explained that "rather than escalate the situation, I agreed to just put the property out there."

[4]    One security guard testified that he noticed that Perdue had a six- or seven-inch knife in his back pocket on this day.

personnel continued to tell Perdue that he was to direct his questions to Rancho Guejito's attorney, as he had been told numerous times. Perdue became "agitated and confrontational when he was told to speak to the lawyer." Perdue left some of the cages on the side of the road and said that he would return on another day to retrieve them.

Perdue returned on February 20, 2012, accompanied by another man, to retrieve the remainder of his personal property.[5] Security personnel were near the front gate of the property when Perdue arrived.[6] Perdue immediately said, " 'Hope you guys haven't been waiting too long.' " The security personnel did not respond. Perdue then said, " '[T]ell Octavio, Jack and Lige we are not finished with them.' " Perdue and his companion used cameras to videotape and take photographs at the main gate, including photographs of the security cameras and the security personnel. At one point, Perdue walked up to the gates and "removed a chain that was securing the gates." One of the Rancho Guejito security employees replaced the chain. Perdue then said, " 'Don't touch me.' " The security employee, who had not touched Perdue, responded by saying, " 'Don't touch me either.' " Perdue came within six inches of the employee's face. "[H]e was grinding his teeth and his chin moved forward, and pointing at [the security guard's] chest." Perdue's demeanor was " 'clearly combative.' " Perdue proceeded to argue with the employee as to whether the road was a county road or not. The employee had earlier

---

5 Perdue identified his companion on this date as Mark Larson. In a declaration, Larson states that he is "a freelance writer and farmer."

6 Security personnel observed that Perdue had a knife in his right rear pocket on this occasion, as well.

called Rupp to ask whether he should allow Perdue to drive past the double gates. After Perdue began walking back to his truck, Rupp responded by saying that the employee should allow Perdue to go down the road "to prevent further problems."[7] The employee told Perdue that Rupp had said to let Perdue proceed past the gates, but Purdue and his companion drove away.

B.    *Procedural history*

Rancho Guejito filed a petition for a workplace restraining order (the Petition) against Perdue on March 5, 2012. That day, the trial court issued a temporary restraining order and set a hearing on the Petition for March 23.

Perdue filed a response and opposition to the Petition on March 22, one day prior to the hearing.

On March 23, the trial court continued the hearing to April 11, and reissued the temporary restraining order against Perdue.

On April 9, two days prior to the date of the hearing on the Petition, Perdue filed a special motion to strike under Code of Civil Procedure[8] section 425.16, the anti-SLAPP law. He was not given a hearing date for the motion at that time, and he did not serve the anti-SLAPP motion on Rancho Guejito prior to the April 11 hearing.

---

[7]    It appears from testimony during the hearing that the road in question is a county road. However, Rancho Guejito had been given permission to place unlocked gates along the road.

[8]    Further statutory references are to the Code of Civil Procedure unless otherwise indicated.

The parties appeared for the hearing on the Petition on April 11. The trial court determined that Perdue's anti-SLAPP motion would have to be decided prior to the court holding a hearing on the Petition. Rancho Guejito's attorneys had not seen the motion until the date scheduled for the hearing on the Petition. Counsel for Rancho Guejito reviewed the anti-SLAPP motion during a recess, and, because Perdue objected to the court maintaining the temporary restraining order in effect if there was going to be a further delay in the hearing on the Petition, elected not to file a formal response to Perdue's anti-SLAPP motion, and instead, orally opposed the motion.

The trial court denied Perdue's anti-SLAPP motion. After denying the motion, the court heard witness testimony concerning the Petition and took the matter under submission. On April 16, 2012, the trial court issued a statement of decision in which it made findings of fact with respect to the Petition and issued a three-year workplace violence restraining order against Perdue.

Perdue filed a timely appeal from the court's April 16 order.

DISCUSSION

A.      *The anti-SLAPP motion*

1.      *Legal standards*

a.      *Legal standards regarding anti-SLAPP motions*

"Whether section 425.16 applies, and whether the plaintiff has shown a probability of prevailing, are both questions we review independently on appeal." (*Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 906; see also *HMS Capital, Inc. v. Lawyers Title Co*. (2004) 118 Cal.App.4th 204, 212 (*HMS Capital*) [orders granting anti-SLAPP motions are reviewed de novo].)

Section 425.16, subdivision (b)(1) provides:  "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."

Resolution of a special motion to strike "requires the court to engage in a two-step process.  First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity.  The moving defendant's burden is to demonstrate that the act or acts of which the plaintiff complains were taken 'in furtherance of the [defendant]'s right of petition or free speech under the United States or California Constitution in connection with a public issue,' as defined in

the statute. [Citation.] If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim." (*Equilon Enterprises v. Consumer Cause, Inc*. (2002) 29 Cal.4th 53, 67 (*Equilon*).)

For purposes of an anti-SLAPP motion, "[t]he court considers the pleadings and evidence submitted by both sides, but does not weigh credibility or compare the weight of the evidence. Rather, the court's responsibility is to accept as true the evidence favorable to the plaintiff . . . ." (*HMS Capital*, *supra*, 118 Cal.App.4th at p. 212.) A plaintiff "need only establish that his or her claim has 'minimal merit' [citation] to avoid being stricken as a SLAPP. [Citation.]" (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 291.)

> b.     *Legal standards related to a workplace violence restraining order petition*

Section 527.8 authorizes an employer to seek restraining orders on behalf of its employees to prevent threats or acts of violence in the workplace by another employee or a third person. (*Scripps Health v. Marin* (1999) 72 Cal.App.4th 324, 333-334 (*Scripps Health*).) Subdivision (a) of section 527.8 provides:

> "Any employer, whose employee has suffered unlawful violence or a credible threat of violence from any individual, that can reasonably be construed to be carried out or to have been carried out at the workplace, may seek a temporary restraining order and an injunction on behalf of the employee and, at the discretion of the court, any number of other employees at the workplace, and, if appropriate, other employees at other workplaces of the employer."

11

Pursuant to the statute, " '[u]nlawful violence' is any assault or battery, or stalking as prohibited in Section 646.9 of the Penal Code, but shall not include lawful acts of self-defense or defense of others."  (§ 527.8, subd. (b)(7).)  The statute defines " '[c]redible threat of violence' " as "a knowing and willful statement or course of conduct that would place a reasonable person in fear for his or her safety, or the safety of his or her immediate family, and that serves no legitimate purpose."  (*Id*., subd. (b)(2).)

A " '[c]ourse of conduct' " is defined as "a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose, including following or stalking an employee to or from the place of work; entering the workplace; following an employee during hours of employment; making telephone calls to an employee; or sending correspondence to an employee by any means, including, but not limited to, the use of the public or private mails, interoffice mail, facsimile, or computer email."  (§ 527.8, subd. (b)(1).)

In order to "obtain a permanent injunction under section 527.8, subdivision (f), a plaintiff must establish by clear and convincing evidence not only that a defendant engaged in unlawful violence or made credible threats of violence, but also that great or irreparable harm would result to an employee if a prohibitory injunction were not issued due to the reasonable probability unlawful violence will occur in the future."  (*Scripps Health, supra,* 72 Cal.App.4th at p. 335.)

12

2.	*Analysis*

    a.	*The activity alleged in the Petition does not fall within the protection of the statute*

The threshold issue in ruling on an anti-SLAPP motion is whether "the challenged cause of action is one arising from protected activity." (*Equilon Enterprises*, *supra*, 29 Cal.4th at p. 67.)  A protected activity is "any act" that is completed "in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue . . . ."  (§ 425.16, subd. (b)(1).)

A defendant can meet the burden of making a threshold showing that a cause of action is one arising from protected activity by demonstrating that the act underlying the plaintiff's cause of action falls within one of the four categories identified in section 425.16, subdivision (e).  (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78.)  Among the protected activities identified in subdivision (e) of section 425.16 are:  "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest,  or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

13

"The anti-SLAPP statute's definitional focus is not the form of the plaintiff's cause of action but, rather, the defendant's *activity* that gives rise to his or her asserted liability—and whether that activity constitutes protected speech or petitioning." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 92.)

" '[W]here a cause of action alleges both protected and unprotected activity, the cause of action will be subject to section 425.16 unless the protected conduct is "merely incidental" to the unprotected conduct [citations] . . . .' [Citation.] '[I]t is the principal thrust or gravamen of the plaintiff's cause of action that determines whether the anti-SLAP[P] statute applies.' [Citation.] ' "[A] plaintiff cannot frustrate the purposes of the SLAPP statute through a pleading tactic of combining allegations of protected and nonprotected activity under the label of one 'cause of action.' " [Citation.] Conversely, a defendant in an ordinary private dispute cannot take advantage of the anti-SLAPP statute simply because the complaint contains some references to speech or petitioning activity by the defendant. [Citation.]' [Citation.]" (*Raining Data Corp. v. Barrenechea* (2009) 175 Cal.App.4th 1363, 1369 (*Raining Data*).) "[I]t is the principal thrust or gravamen of the plaintiff's cause of action that determines whether the anti-SLAPP statute applies [citation], and when the allegations referring to arguably protected activity are only incidental to a cause of action based essentially on nonprotected activity, collateral allusions to protected activity should not subject the cause of action to the anti-SLAPP statute.' [Citation.]" (*Ibid.*)

The trial court did not err by denying the anti-SLAPP motion because the gravamen of the Petition does not arise from protected activity. The Petition for the

workplace restraining order described various conduct in which Perdue had engaged.

Among the conduct identified was the following:

(1)  That the situation began when Perdue claimed that he was owned money for services he had provided to Rancho Guejito and he was not paid immediately;

(2)  That Perdue had told Rupp and Barnett that " '[i]t would be a lot better for you (RANCHO) to have me as a friend than an enemy' ";

(3)  That Perdue continued to try to communicate with Rancho Guejito employees about the payments through e-mails, despite having been informed on November 1 and reminded on November 17, 2011, that he was to not to attempt to communicate with Rancho Guejito employees and was to communicate only with Rancho Guejito's attorney, Gregory Kane;

(4)  That Perdue did not heed this admonition, and on November 18, 2011, Kane informed Perdue that his e-mail address would be placed on the " 'blocked sender' list of all RANCHO employees to prevent him from bothering them";

(5)  That on December 2, 2011, Perdue used subterfuge by claiming to be a delivery person in order to gain access to the property, and thereafter followed an employee to the Rancho Guejito offices and attempted to follow her inside.  Perdue "tried to force himself into the office," but the employees refused to allow him to enter or to accept anything from him.  Perdue was again told that he would have to contact the attorney, Gregory Kane, concerning any business that Perdue had with Rancho Guejito;

(6)  That on January 10, 2012, Perdue sent a letter and e-mail message to Rancho Guejito personnel, despite having been told not to do so.  Perdue admitted that he had hired a helicopter to fly over the property to investigate the cattle so that he "could report [Rancho Guejito] to the authorities."  Perdue attached photographs of dead cows;

(7)  That on January 13, 2012, Perdue exchanged e-mail messages with Kane regarding Perdue's repeated attempts to contact Rancho Guejito personnel.  Perdue stated that Rancho Guejito "has enough problems without pissing me . . . off";

15

(8)  That on or around January 20, 2012, Perdue began using a new e-mail address in order to continue to communicate with Rancho Guejito personnel, in an apparent attempt to circumvent his having been placed on the " 'blocked sender'  list";

(9)  That on January 31, 2012, Perdue sent an e-mail to Kane stating that *Kane* was not to contact *Perdue* anymore;

(10)  That on February 9, 2012, Coates and Peter Bozzo sent Perdue a letter via certified mail insisting that he stop contacting Rancho Guejito personnel and instead communicate only with Kane;

(11)  That on February 14, 2012, Perdue and two other men were seen by Rancho Guejito employees driving up the dirt road leading to the main gate of Rancho Guejito.  The employees drove toward the area, but Perdue turned the truck around and headed toward the exit.  Once near the main entrance to the property, Perdue stopped the truck and one of the passengers began taking photographs of the property, including the security cameras on the property;

(12) That on February 17, 2012, Perdue was aggressive and confrontational with ranch security personnel when he arrived at a prearranged appointment to retrieve some of his personal property, which personnel had placed outside of the Rancho Guejito gate.  Perdue took photographs of Rancho Guejito security personnel, and, after hooking a trailer up to his truck, asked them, " 'Do you have permits?' "  One employee interpreted Perdue's question as asking whether they had permits for their holstered weapons.  Perdue then stated, " 'You know this is a county road all the way up to the double gates[.]' "  Perdue asked other questions, but the security personnel continued to tell Perdue that he was to direct his questions to Rancho Guejito's attorney, as he had been told numerous times;

(13)  That on February 20, 2012, Perdue arrived with another man to retrieve the remainder of his personal property.  Perdue said to security personnel, " '[T]ell Octavio, Jack and Lige, that we are not finished with them.' "  Perdue and his companion used cameras to videotape and take photographs at the main gate, including taking photographs of the security cameras and the security personnel.  Perdue's demeanor was " 'clearly combative' "; and

16

(14) That on February 23, 2012, a Rancho Guejito employee observed a red helicopter flying over the Rancho Guejito property. The red helicopter looked similar to the red helicopter that Perdue had admitted using when he flew over the property before and took photographs of the dead cattle.

Perdue contends that the Petition alleges a cause of action arising from protected activity because all of the acts underlying the Petition fall into one of two of the four categories identified as protected activities under section 425.16, subdivision (e)—i.e., "written or oral statement[s] or writing made in a place open to the public or a public forum in connection with an issue of public interest," or "other conduct in furtherance of the exercise of the constitutional right of petition or the constitution right of free speech in connection with a public issue or an issue of public interest." Perdue suggests that Rancho Guejito's Petition sought to restrain him from flying " 'over or near the property' " in an attempt to prevent him from being able to "report[] Rancho Guejito's activities to government authorities." Perdue further contends that the "public interest" component of subdivisions (e)(3) and (e)(4) of section 425.16 is met because "[t]here is a strong public interest in the Rancho Guejito property," which he asserts is evidenced by "the multitude of media articles about Rancho Guejito and community involvement concerning the preservation of Rancho Guejito's land." According to Perdue, a number of the events about which Rancho Guejito complained in its Petition involve him taking photographs or video, bringing reporters to take photographs, or asking about a public county road adjacent to the property. Perdue claims that all of these things constitute activities performed in accordance with his First Amendment rights, in that he was documenting activities of public interest, such as the preservation of environmentally sensitive habitats.

17

Although there are some activities alleged in the Petition that arguably involve conduct that may implicate Perdue's First Amendment rights, such as the taking of video or photographs from public locations, including from public air space, the description of Perdue's conduct that Rancho Guejito raises in its Petition illustrates that the *principal thrust or gravamen* of Rancho Guejito's Petition seeking a workplace violence restraining order is *nonprotected* activity, particularly Perdue's harassing behavior toward Rancho Guejito personnel about being paid, as well as his threatening comments and behavior, including an instance in which he used subterfuge to gain access to the Rancho Guejito property. Perdue repeatedly contacted Rancho Guejito personnel despite having been directed numerous times to communicate solely with Rancho Guejito's attorney. It is this conduct that forms the thrust of Rancho Guejito's Petition to enjoin Perdue from further harassment.[9]

We conclude that the potentially protected conduct mentioned in the Petition is " 'only incidental to [the] cause of action based essentially on nonprotected activity.' [Citation.]" (*Raining Data*, *supra*, 175 Cal.App.4th at p. 1369.) Despite Perdue's suggestion that the "majority of" the acts alleged in support of the Petition "involved Perdue taking photographs or videotaping Rancho Guejito from public property or airspace, taking reporters near Rancho Guejito, or asking about a public county road that

---

[9] Perdue does not argue that his conduct in repeatedly communicating with Rancho Guejito personnel despite being asked to communicate only through its attorney, or his conduct in making threatening comments, displaying aggressive behavior to those personnel, and using subterfuge to enter the property was "protected activity" for purposes of the first prong of the anti-SLAPP analysis, thereby conceding that it was not.

18

was gated by Rancho Guejito personnel," a review of the allegations about Perdue's conduct that are identified in the Petition demonstrates that of the 14 different incidents raised, only four even mention such activities (the February 14, February 17, February 20, and February 23, 2012 incidents). Further, even with respect to these particular incidents, with the exception of the February 23 incident, it is clear that the conduct about which Rancho Guejito is complaining is Perdue's repeated appearances at the Rancho Guejito property and his confrontations with Rancho Guejito staff. The brief references to the fact that someone, either Perdue himself, or someone he brought with him, was photographing or video recording, are mentioned only to provide context regarding the interactions, and do not form the crux of Rancho Guejito's complaints about Perdue's behavior. There is nothing in the Petition that would suggest that Rancho Guejito was attempting to prevent Perdue from talking to the press, informing governmental agencies of concerns that he might have regarding the Rancho Guejito property, or engaging in other protected activities. Although the allegations concerning the February 23, 2012 incident referred to a possible sighting of Perdue using a helicopter to fly over the Rancho Guejito property, which arguably constitutes nonexpressive conduct to facilitate Perdue's exercise of free speech protected by the constitution, this conduct clearly did not form the crux of Rancho Guejito's Petition and instead, is merely incidental to the overall thrust of the Petition. Contrary to Perdue's portrayal of the dispute between him and Rancho Guejito as one with broader public implications, it is, at its core, an "ordinary private dispute" (*Raining Data, supra,* 175 Cal.App.4th at p. 1369) between these parties. The fact that the Petition contains some references to potentially protected speech or

petitioning activity by Perdue is insufficient to allow Perdue to take advantage of the anti-SLAPP statute.[10]

    b. *Rancho Guejito demonstrated a probability of prevailing on the merits*

"[I]n order to establish the requisite probability of prevailing (§ 425.16, subd. (b)(1)), the plaintiff need only have ' "stated and substantiated a legally sufficient claim." ' [Citation.]"  (*Navellier*, *supra*, 29 Cal.4th at p. 88.)  " '[T]he plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." ' [Citation.]"  (*Id.* at pp. 88-89.)

The showing required for purposes of overcoming an anti-SLAPP motion is only that the claim being made is one of "minimal merit."  (*Navellier*, *supra*, 29 Cal.4th at p. 93.)  Rancho Guejito met that standard by presenting evidence in support of its Petition, in the form of declarations supporting the allegations of the Petition, that Perdue conveyed a credible threat of violence to Rancho Guejito employees at their workplace, and that irreparable harm would result to an employee if a prohibitory injunction did not issue because there was a probability that Perdue would engage in unlawful violence in the future.  (See *Scripps Health*, *supra*, 72 Cal.App.4th at p. 355.)

---

10 This determination is bolstered by the fact that, as the trial court noted, the restraining order issued against Perdue does not affect his First Amendment rights.  We agree with the trial court's conclusion that the restraining order "will have no impact on Perdue's constitutionally-protected activities."  As the trial court accurately describes, "Perdue is free to talk to the press; he is free to convey information to governmental agencies; and he is free to petition the government for redress.  But he is not free to trespass onto Rancho Guejito's property or to harass Rancho Guejito's personnel."

In the Petition, Rancho Guejito set forth a number of allegations demonstrating that Perdue conveyed a credible threat of violence to employees at their workplace, and supported those allegations with declarations from the employees. Again, under the statute, a " '[c]redible threat of violence' " is "a knowing and willful statement or course of conduct that would place a reasonable person in fear for his or her safety, or the safety of his or her immediate family, and that serves no legitimate purpose." (§ 527.8, subd. (b)(2).) Rancho Guejito presented evidence that after Rancho Guejito refused to pay Perdue's "invoices," he told one of Rancho Guejito's employees, " 'It would be better for you (Rancho Guejito) to have me as a friend than an enemy.' " Rancho Guejito also presented evidence that after making this statement, and after being told numerous times not to contact Rancho Guejito employees directly, Perdue repeatedly e-mailed Rancho Guejito staff, asking about the payment that he claimed he was owed. The declarations that Rancho Guejito submitted further demonstrated that Perdue continued this harassing conduct when he appeared at a restricted access gate on the Rancho Guejito property, presenting himself as someone with a delivery, but not identifying himself. He gained access to the property using this ruse, and followed an employee to the office door. After this event, Perdue wrote in an e-mail to Kane, "It seems to me that the management there has enough problems already without pissing me off."

Perdue's course of conduct as outlined in Rancho Guejito's Petition and supported by the declarations was sufficient to place a reasonable person in fear for his or her safety. Perdue made actual threats, including telling employees that it would be better "to have [him] as a friend than an enemy," and made an implied threat when he said that

21

management had enough problems "without pissing [him] off." These statements, particularly when combined with Perdue's repeated contacting of employees and his penchant for appearing on the Rancho Guejito property or just outside of its boundaries despite knowing that he was not welcome, are sufficient to constitute a credible threat of violence.

Perdue cites to the California Judges Benchguide 20: Injunctions Prohibiting Civil Harassment and Workplace/Postsecondary School Violence (2012), section 20.69, pages 20-41, to posit that his conduct in this matter did not amount to a "credible threat of violence" and instead constituted activities with a legitimate purpose. He quotes the following passage: "The conduct about which the petitioner complains must serve no legitimate purpose in order to constitute civil harassment. If the petitioner admits to owing money to the respondent, then it is not civil harassment for the respondent to call the petitioner on a reasonably consistent basis to ask when the petitioner will satisfy this debt." Perdue fails to acknowledge two important distinctions regarding what the Petition alleged happened here. First, the conduct about which Rancho Guejito complained went beyond mere calling on a "reasonably consistent basis" to ask for satisfaction. It included actually threatening, and repeatedly contacting, various employees after having been told to communicate with only one individual regarding his claim. Second, Rancho Guejito did not admit to owing Perdue money, and, in fact, disputed the validity of his claim for $326,000.

The escalating nature of Perdue's conduct, including his aggressive and combative interactions with Rancho Guejito security personnel after he had made threatening

statements and continued to contact other employees, demonstrated a reasonable probability that Perdue would continue to engage in this type of conduct, and would engage in additional threatening and violent behavior if not restrained from doing so.

B.    *The trial court did not err in issuing the workplace violence restraining order*

Perdue contends that the trial court erred in granting Rancho Guejito's Petition and issuing a restraining order against him.

1.    *Legal standards*

As set forth in part III.A.1.b., *ante*, in order for an employer to "obtain a permanent injunction under section 527.8, subdivision (f), a plaintiff must establish by clear and convincing evidence" both "that a defendant engaged in unlawful violence or made credible threats of violence," and "that great or irreparable harm would result to an employee if a prohibitory injunction were not issued due to the reasonable probability unlawful violence will occur in the future." (*Scripps Health*, *supra*, 72 Cal.App.4th at p. 335.)

"On appeal . . . we review an injunction issued under section 527.8 to determine whether the necessary factual findings are supported by substantial evidence. [Citation.] Accordingly, we resolve all factual conflicts and questions of credibility in favor of the prevailing party, and draw all reasonable inferences in support of the trial court's findings." (*City of San Jose v. Garbett* (2010) 190 Cal.App.4th 526, 538.)  We affirm a judgment if it is supported by substantial evidence, even though substantial evidence to the contrary exists and would have supported a different result. (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631.)  " ' The sufficiency of evidence to establish a

23

given fact, where the law requires proof of the fact to be clear and convincing, is primarily a question for the trial court to determine, and if there is substantial evidence to support its conclusion, the determination is not open to review on appeal.' [Citations.]" (*Crail v. Blakely* (1973) 8 Cal.3d 744, 750.)

In addition, the trial court's exercise of its discretion to grant injunctive relief "will not be disturbed on appeal absent a showing of a clear abuse of discretion. [Citation.]" (*Shapiro v. San Diego City Council* (2002) 96 Cal.App.4th 904, 912.)

2.      *Analysis*

a.      *Rancho Guejito's motion to strike*

As an initial matter, we must address Rancho Guejito's motion to strike certain portions of Perdue's opening brief on appeal. After Perdue filed his opening brief, Rancho Guejito filed a motion to strike references in Perdue's appellate brief to a security video recording that captured some of the December 2, 2011 incident in which Perdue used subterfuge to gain entry to the Rancho Guejito property. Rancho Guejito argues that the trial court did not view this particular recording, that this recording was not admitted in evidence in the trial court, and that the recording is therefore not part of the appellate record on review. Rancho Guejito also moved to strike the references in Perdue's briefing regarding "alleged 'illegal' road grading" because this court denied Perdue's request to take judicial notice of certain documents purporting to relate to violations and/or warnings various governmental agencies issued to Rancho Guejito

The parties dispute whether the video recording on which Perdue relies is part of the appellate record. Our review of the record and the papers filed by the parties with

24

respect to Rancho Guejito's motion to strike reveals the following relevant background: The recording in question is apparently one of five videos that existed on a single "thumb drive," two of which Rancho Guejito's attorney sought to admit as evidence at the hearing. Perdue's attorney apparently had not received the copy of the videos that Rancho Guejito had served on him prior to the hearing, and he objected to the introduction of any of the video recordings on the thumb drive. During a break, Perdue's attorney was given the video recordings that Rancho Guejito was offering to watch. After the break, Perdue's attorney no longer objected to Rancho Guejito offering, and the court admitting, the two videos at issue. The court reviewed the two videos during the evidentiary hearing. The entire thumb drive was lodged as "Exhibit C."

At some point after the April 11 hearing, the thumb drive was lost. Neither the parties nor the court were able to locate it. In the process of having an identical thumb drive marked as Exhibit C, it became clear that there were five separate videos on the thumb drive, that Rancho Guejito had offered only two of the five videos in evidence, that the trial court had reviewed only these two videos, and that those two videos were the only videos on the thumb drive that had been admitted in evidence. The record thus establishes that there was no ruling regarding the admissibility of the other three videos because they were not offered as evidence. The record does not establish why Perdue did not seek to have the video on which he relies in his appellate brief introduced as

evidence, particularly in view of the fact that he maintains that it supports his position with respect to the evidence underlying the workplace violence restraining order.[11]

Perdue argues that because the entire thumb drive was lodged as Exhibit C, all of the videos on Exhibit C are a part of the record on appeal. Absent certain exceptions not relevant here, "all exhibits admitted in evidence, refused, or lodged are deemed part of the record." (Cal. Rules of Court, rule 8.122(a)(3).) However, we conclude that the California Rules of Court, rule 8.122 was not intended to encompass items collectively placed in a digital "container" but never independently offered in evidence, or even mentioned, at the evidentiary hearing to be considered part of the appellate record. For this reason, we agree with Rancho Guejito that the specific video to which Perdue refers is not part of the record on appeal. We therefore grant Rancho Guejito's motion to strike Perdue's references to this video.[12]

---

[11] Perdue seems to suggest that Rancho Guejito's attorney somehow concealed the existence of the video from him and from the court: "[A]nother video . . . , which was on the memory stick but was not identified by Rancho Guejito to the Trial Court or to Perdue, clearly shows . . . ." However, there is no allegation that there was any discovery violation, nor does Perdue explain why he did not attempt to discover whether additional video recordings of the event in question existed.

[12] Even if we were to consider the video on appeal, we would conclude that it simply does not assist Perdue in the manner he believes it does. The video in question is a silent video that shows Perdue following Soto to the office door, walking directly up to the door, standing on the stoop, and after a period of time, walking away. In the context of all of the evidence presented with respect to Perdue's pattern of threatening and harassing behavior, the content of this video does not exonerate Perdue and establish that Perdue was in some way prejudiced by the trial court not viewing the video. Rather, the video confirms that Perdue gained access to the property despite having been told multiple times not to contact Rancho Guejito employees and to communicate only with Kane. The employees interpreted this behavior, itself, as threatening and frightening, and were

26

With respect to Rancho Guejito's motion to strike the references in Perdue's briefing regarding "alleged 'illegal' road grading," we deny the motion. The documents of which Perdue wanted this court to take judicial notice are government documents relating to notices of violations and/or warnings purportedly issued by government agencies to Rancho Guejito related to road grading on the property, waste discharge violations, and unauthorized discharge of fill material. Our decision to not take judicial notice of these documents does not mean that there is nothing in the record pertaining to Perdue's allegations of improper road grading. Perdue testified regarding viewing this grading and his concern that the grading had been performed without being properly permitted.

b. *There is substantial evidence to support the trial court's determination that Perdue made credible threats of violence*

Perdue contends that there is insufficient evidence that he committed "unlawful violence." Perdue asserts that the trial court found that on December 2, 2011, he committed an act of "unlawful violence" when he arrived at the property and gained entrance through the gate by using subterfuge. Perdue makes much of the fact that the trial court appeared to rely on Soto's declaration in concluding that Perdue "tried to force his way inside Rancho Guejito's offices," and complains that Soto's declaration is contradicted by Perdue's testimony, as well as by Barnett's testimony.

worried that Perdue might injure them. We are convinced that the trial court would not have reached a different conclusion if it had viewed the additional video of the December 2, 2011 incident.

27

What Perdue fails to acknowledge is that the statute requires that the respondent have engaged in "unlawful violence" *or* "a credible threat of violence" in order for a workplace violence restraining order to issue. By focusing on only the "unlawful violence" aspect, Perdue ignores the significant and substantial evidence that his conduct amounted to a "credible threat of violence," as the trial court found. Perdue's conduct in arriving at Rancho Guejito on December 2, 2011, coming to the gate on foot after hiding his car, failing to identify himself, and attempting to see Barnett, all after having been told multiple times by that point that he was *not to have any contact* with any Rancho Guejito employees, was itself threatening and harassing behavior, irrespective of whether he ultimately made any physical attempt to force his way through the office door.

Again, the statute defines "[c]redible threat of violence" as "a knowing and willful statement or course of conduct that would place a reasonable person in fear for his or her safety, or the safety of his or her immediate family, and that serves no legitimate purpose." (§ 527.8, subd. (b)(2).) Perdue suggests at various points in his briefing that he had a "legitimate purpose" for virtually all of his conduct. For example, he contends that the purpose of two of his visits to Rancho Guejito was to retrieve his personal property, and that his flying in a helicopter over the property was a constitutionally protected act, as was his bringing journalists and/or photographers to the property. Perdue also contends that he was simply attempting to "get payment on his invoices," which, he asserts, is a "legitimate purpose." As we have already explained, Perdue's repeated and harassing attempts to get Rancho Guejito personnel to pay him the $326,000 that he was demanding (despite the absence of any contract between the parties, oral or

28

written, to support such a claim), cannot be considered to have been done for a "legitimate purpose."

Perdue failed to comply with Rancho Guejito's reasonable request that he communicate only with Kane about the matter, and ignored that request numerous times. Further, his "requests" for payment went beyond simply asking to be paid. Instead, Perdue made various threats in his demands for payment. Such conduct cannot reasonably be considered "legitimate." Perdue *presumes* that his demand for payment was valid, and concludes that his demands for payment were therefore legitimate. However, Rancho Guejito has always disputed Perdue's "invoices." In this context, Perdue's repeated harassment of Rancho Guejito employees about being paid on the disputed invoices cannot be considered to have been legitimate.

Further, there is ample evidence of Perdue's vague and repeated threats to Rancho Guejito employees. Rancho Guejito witnesses Rupp and Barnett stated that at the October 2011 meeting, Perdue said, " 'It would go a lot better for Rancho Guejito if I was your friend rather than your enemy,' " and that when asked what he meant by that, he responded, " 'You'll see.' " The trial court determined that these statements "reasonably caused Rupp and Barnett to fear for their safety." Given this evidence, the trial court's conclusion that Perdue made a credible threat of violence is wholly reasonable. Further, Perdue later made another indirect and vague threat when he told Kane that Rancho Guejito "has enough problems already without pissing me off." Other Rancho Guejito employees said that Perdue asked them to " '[t]ell Octavio, Jack and Lige, that we are not finished with them.' " These statements, together with Perdue's repeated appearances at

29

the Rancho Guejito property, constitute substantial evidence that Perdue engaged in a course of conduct that constituted a credible threat of violence. A reasonable person would find this behavior troubling and cause for fear.

There is clearly substantial evidence to support the trial court's findings that Perdue engaged in a pattern of conduct that amounted to credible threats of violence, justifying the trial court's issuance of the workplace violence restraining order.

        c.      *The trial court did not err in considering the threat that Perdue made at a restaurant*

Perdue suggests that the trial court improperly considered the threat that Perdue made to Rupp and Barnett at an off-site restaurant in October 2011. He contends that this statement is insufficient to support a finding of a credible threat of violence, and that the trial court should not have considered the statement in its analysis, because (a) it was not a threat made at the workplace, (b) it was not a threat of "violence," and (c) Perdue had a legitimate purpose, in that he was "[s]eeking to get paid for work performed . . . ." These arguments are meritless.

First, a threat need not be made at the workplace in order for it to be considered in determining whether a workplace violence restraining order should issue. A court must conclude that the threat of violence "can reasonably be construed to be carried out *or* to have been carried out at the workplace" (§ 527.8, subd. (a), italics added). It is therefore not an issue that the threat was made at an off-site restaurant. The critical question is whether there is substantial evidence to support the court's conclusion that Perdue made a threat that could reasonably be construed to be carried out at the workplace. (See *City of*

30

*Los Angeles v. Animal Defense League* (2006) 135 Cal.App.4th 606, 625-626 [because offensive internet postings contained protected employee's home address but not office address, postings could not "reasonably be construed as threats to be carried out at the workplace"].)

Second, this threat could reasonably be construed as a threat of "violence," particularly given Perdue's conduct during the relevant time period. Perdue suggests that it was not a threat against anyone's safety. However, the victims of the threat, and the court, disagreed. The statement, " 'You'll see' " when Perdue was asked what he meant when he said, " 'It would go a lot better for Rancho Guejito if I was your friend rather than your enemy,' " was particularly frightening to Rancho Guejito employees. After making these statements, Perdue went on to behave in a harassing manner, repeatedly contacting employees, attempting to enter the property, and engaging in confrontational behavior. Given his multiple ambiguous threats and his unusual conduct, employees were justifiably concerned about how far Perdue would take his harassing behavior. The fact that the original threatening statement was vague, like the others, does not mean that the statement could not induce reasonable fear for one's safety in those to whom it was directed. If anything, the fact that the threat left open what Perdue might do to exact his revenge meant that employees could reasonably fear the worst.

Finally, Perdue's suggestion that he had a "legitimate purpose" in making this threat is unpersuasive. Even if we were to assume that Perdue made the statement in an

31

attempt to obtain payment for a legitimate debt, there is simply no legitimate purpose in making this type of threat to one who refuses to pay the debt.[13]

        d.    *There is substantial evidence to support the trial court's determination that great or irrevocable harm is likely to occur in the future*

Perdue contends that there is insufficient evidence to support the trial court's finding that there is a likelihood of future harm. Perdue argues that because there is no evidence that he has committed wrongful acts in the past, there can be no evidence that he is likely to commit such acts in the future. Perdue's argument is based on the premise that he did nothing wrong in any of the actions he directed at Rancho Guejito employees. However, as we have concluded, there is abundant evidence to support the court's findings that Perdue's past conduct amounted to a credible threat of violence.

Perdue compares this situation with the situation addressed in *Scripps Health*, *supra*, 72 Cal.App.4th 324. The injunction issued by the trial court in *Scripps Health* arose from a tension-filled meeting between a hospital administrator and Marin, a patient's son. When the administrator insisted that they needed to discuss Marin's mother and stood in front of the door, blocking Marin's exit from the meeting room, Marin pulled the door open, causing it to hit the administrator and push her into the wall. (*Id*. at p. 328.) After this single violent act, two significant things occurred. First, Marin's mother transferred her health insurance and thus was unlikely to return to the facility where her son's violent act occurred. (*Id*. at p. 336.) In addition, Marin had agreed to stay away

---

[13]    As should be clear by this point, we do not mean to suggest in any way that Rancho Guejito has conceded that it owes Perdue any of the money he was demanding.

from the hospital, and had fulfilled this promise during the two-month time period between when the temporary restraining order was vacated and the hearing on a permanent injunction was held.  (*Ibid*.)   Based on these facts, the appellate court found insufficient evidence that Marin would repeat any violent conduct against employees at Scripps and therefore concluded that a workplace violence restraining order should not have been issued against him.  (*Ibid*.)

Perdue, by contrast, repeatedly communicated with Rancho Guejito employees and appeared on or near the property on multiple occasions.  Further, unlike Marin, who had engaged in a single incident of violence but had no history of threatening conduct, Perdue engaged in a series of harassing and threatening conduct over a period of months. " '[C]ontext is critical in a true threats case and history can give meaning to the medium.' [Citations.]"  (*Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.* (2005) 129 Cal.App.4th 1228, 1250.)  Perdue's pattern of conduct and his repeated vague threats constitute substantial evidence to support the trial court's determination that irreparable harm was reasonably likely to occur if the injunction were not issued.

IV.

DISPOSITION

The trial court's order denying Perdue's anti-SLAPP motion and its order issuing a three-year workplace violence restraining order are affirmed.  Rancho Guejito is entitled to costs on appeal.

_____

AARON, J.

WE CONCUR:


_____

NARES, Acting P. J.


_____

IRION, J.